**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| OLGA ZUNIGA, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | No. 1:18-cv-434 |
| | § | |
| JUSTICE KEVIN PATRICK YEARY, IN HIS | § | |
| OFFICIAL AND INDIVIDUAL CAPACITIES, | § | |
| *Defendant*. | § | |

**DEFENDANT'S MOTION TO DISMISS**

Plaintiff Olga Zuniga was terminated from her employment as the executive assistant to Texas Court of Criminal Appeals Place 4 Judge Kevin Patrick Yeary because he had lost trust and confidence in her. In this lawsuit, Zuniga alleges that Judge Yeary terminated her because of her political affiliation and political posts she made on Facebook—a dismissal which she claims violated her rights under the Free Speech Clause of the First Amendment to the United States Constitution.[1] However, as a judge elected by Texas citizens to discharge the oath of the state's highest criminal court, Yeary is entitled to select an executive assistant whom he trusts with the court's confidential matters and who demonstrates loyalty to him and his interests as an elected official. The speech at the center of Zuniga's claim was publicly posted on Facebook—a forum in which Zuniga repeatedly associated herself with Judge Yeary and the Court of Criminal Appeals while at the same time posting lewd, unprofessional content and offensive, partisan criticisms of Republican officials, the Court, and Judge Yeary himself.

Judge Yeary asks this Court to dismiss Zuniga's lawsuit for failure to state a claim because, under the facts as pleaded, Zuniga is a confidential employee whose interest in making lewd

---

[1] Pl.'s First Amend. Compl. ("Compl."), at ¶ 1.

1

comments and disparaging the Court and other Republican officials on the same Facebook page in which she publicly identified herself as a member of Judge Yeary's chambers staff was not outweighed by Judge Yeary's interest in employing an executive assistant who holds his trust and confidence. Additionally, Judge Yeary in his individual capacity is entitled to qualified immunity because it is not clearly established that an elected judge's executive assistant who engages in such speech is entitled to First Amendment protection from dismissal. And in any event, Judge Yeary's alleged actions in dismissing Zuniga were not unreasonable in light of Fifth Circuit precedent.

## FACTUAL ALLEGATIONS

Zuniga was hired in 2003 as the Executive Assistant to the Place 4 Judge on the Texas Court of Criminal Appeals—Texas' criminal court of last resort.[2] Judges of the Texas Court of Criminal Appeals are elected in partisan political elections, and Judge Yeary was elected to Place 4 in November 2014.[3] Though Judges on the Texas Court of Criminal Appeals may—and often do—select their own chambers staff, including their executive assistant, staff attorney, and law clerk, upon taking the bench, Judge Yeary agreed to allow Zuniga to stay on as his executive assistant.[4] Zuniga's Complaint is notably quiet with respect to the job duties and responsibilities of a judicial executive assistant. However, at a minimum, Zuniga pleads that she had access to Judge Yeary's confidential pre-decisional legal opinions and other case-related materials.[5]

---

[2] Compl. ¶ 6.

[3] Compl. ¶ 9.

[4] Compl. ¶10.

[5] See Compl. ¶ 22. Instead of describing what her job duties were, Zuniga conclusorily characterizes her work and the information to which she had access in chambers as non-political. However, as explained further below, such allegations are not worthy of this Court's credence, even in this 12(b)(6) posture, because they fly in the face of the inherently confidential, policy-making nature of judicial work product and internal court information.

During her employment in his chambers, Judge Yeary observed that Zuniga used Facebook on her State computer, even though assigned tasks were not being completed.[6] Curious about what his assistant was doing at work, on November 9, 2016, Judge Yeary "searched online to find Zuniga's Facebook profile."[7] Since the two were not Facebook "friends," Judge Yeary could only see Zuniga's public posts.[8] On November 9, Judge Yeary would have been able to see that about a month earlier, on October 13, 2016, Zuniga posted a photo of him attending the Red Mass, a Catholic service honoring the judiciary.[9] In the post, she referred to Judge Yeary as "My Judge" and indicated that he was "in attendance representing our Court."[10]

A review of Zuniga's Facebook page reveals that she publicly associated herself with the Court of Criminal Appeals,[11] Court activities,[12] Court personnel,[13] and Judge Yeary—including

---

[6] Compl. ¶14; **Ex. 1 at 2**. Zuniga pleads that Judge Yeary submitted a statement to the Texas Workforce Commission in which he identified reasons for her termination, including "that Zuniga's Facebook postings were a reason for her termination." Compl. ¶ 19. Documents attached "to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (citation omitted). To this end, Defendant has attached the referenced statement from Zuniga's TWC file ("TWC Statement," **Ex. 1**) and copies of Facebook posts mentioned in the Complaint and central to the allegations. In attaching such materials, a "defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Id.* at 499.

[7] Compl. ¶ 14; **Ex. 1 at 2**.

[8] Compl. ¶¶14, 16-17; **Ex. 1 at 2**.

[9] **Ex. 3**.

[10] *Id.*

[11] *E.g.*, **Ex. 4** (post about "positions at my work," the "Texas Court of Criminal Appeals"); **Ex. 5** (Check-in at Moviehouse & Eatery, stating "Most of the Court of Criminal Appeals is here. The Judges are treating us to a movie and lunch as a thank you for our work during session."); **Ex. 6** (Check-in at Texas Court of Criminal Appeals, stating that it is the 125th anniversary of "my Court.").

[12] *E.g.,* **Ex. 7** ("My beloved Judge Paul Womack…[is] retiring from the Court of Criminal Appeals").

[13] *E.g.,* **Ex. 8** (Link to article by retired Judge Cochran, stating "we sure miss her at our Court."); **Ex. 9** ("With Judge Yeary and other co-workers from our chambers."); **Ex. 10** ("[C]elebrating my co-worker, Ali's birthday. Lunch also with Judge Yeary and Gary."); **Ex. 11** ("Please read this article. My friend…who used to work with me in the Court of Criminal Appeals is featured.")

by posting photos of him and referring to him as "my judge."[14] In addition to associating herself with the Texas Court of Criminal Appeals and with him, Judge Yeary also observed that Zuniga had publicly posted the following:[15]



After seeing this post, Judge Yeary "called Zuniga into his office and counseled her about her Facebook posts."[16] According to the TWC Statement referenced in Zuniga's Complaint, Judge Yeary told Zuniga that it was inappropriate for her to post lewd content given her choice to publicly associate herself with the Court and with him.[17] After this counseling, Zuniga continued to use

---

[14] *E.g.,* **Ex. 12** ("At the swearing in ceremony of my new judge, Kevin Patrick Yeary" with photo); **Ex. 13** (Photo of Judge Yeary at Scholtz's); *see also* **Ex. 1 at 2** ("A perusal of her postings revealed that she had identified herself as an employee of the Texas Court of Criminal Appeals and as my employee as well.").

[15] **Ex. 17**.

[16] Compl. ¶ 15.

[17] Compl. ¶ 19 (describing that Judge Yeary counseled her regarding the Facebook posts); **Ex. 1 at 2-3**.

Facebook at work on her official state computer and post publicly, with apparently little regard for whether Judge Yeary (or anyone else) saw her posts.[18]

According to the Complaint, at issue are Zuniga's "comments on Facebook regarding politicians and political issues," some of which "expressed support for Democratic candidates and were critical of certain Republican politicians, including Donald Trump."[19] The TWC Statement reflects that, on or about September 23, 2017, Judge Yeary again viewed Zuniga's public page and saw that she had described other elected Republican officeholders as "asshole[s]."[20]

The TWC Statement also describes the following post and comments:[21]



On top of her reference to the conservative members of the Court (and the judge in whose chambers she served) as "damn Republicans," and agreement with the description of her place of

---

[18] Compl. ¶¶ 16 & 17; **Ex. 1 at 3** (Even after being counseled about it, Zuniga "[s]till had postings indicating that she was an employee of the Texas Court of Criminal Appeals and that she worked for me.").

[19] Compl. ¶ 14.

[20] **Ex. 1 at 3-4**; Compl. ¶16 & 17; see also, *e.g.*, **Exs. 14 & 15**.

[21] Compl. ¶16 & 17; **Ex. 1 at 3-4**; **Ex. 18**.

employment as a "DICK-TATORSHIP," the post that ultimately proved too unprofessional was this one:[22]



According to the TWC Statement, Judge Yeary considered this public post "indecent," "offensive," and "totally inappropriate for a person who also identified themselves on their public Facebook page as an employee of the Texas Court of Criminal Appeals and as a person who worked directly for me."[23]

Zuniga alleges that she was terminated "[o]n or about October 11, 2017," and that "[i]n the meeting when he terminated Zuniga, Yeary specifically raised Zuniga's political Facebook posts

---

[22] Compl. ¶16, 17; **Ex. 1 at 3-4**; **Ex. 19**.

[23] **Ex. 1 at 3**.

and expressed his disapproval of them."[24] Based upon the forgoing, Zuniga alleges that Judge Yeary "violated the First Amendment to the United States Constitution . . . by terminating Ms. Zuniga's employment because of her exercise of the right to free speech and/or political party affiliation."[25]

## STANDARD OF REVIEW

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper when a complaint fails to state a claim upon which relief can be granted.[26] To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[27] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[28] Though courts must accept all well-pleaded facts as true, they "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."[29] Thus, a complaint must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements."[30] The factual allegations must be enough to "raise a right of relief above the speculative level," on the assumption that those factual allegations are true.[31]

---

[24] Compl. ¶18.

[25] Compl. ¶ 27.

[26] Fed. R. Civ. P. 12(b)(6).

[27] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

[28] *Id.*

[29] *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009).

[30] *Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 525 (S.D. Tex. 2009), *aff'd* 631 F.3d 777 (5th Cir. 2011) (citing *Twombly,* 550 U.S. at 555).

[31] *Twombly,* 550 U.S. at 555.

A. **Zuniga, a confidential employee of an elected judge whose speech was directly hostile to the court for which she worked and other elected officials with whom Judge Yeary interacted, has failed to allege a First Amendment violation.**

It is well-established that public employees' right to exercise free speech is not unlimited and that "certain First Amendment rights may legitimately be restrained where [their exercise] could lead to an inability of elected officials to get their jobs done on behalf of the public."[32] In *Gentry v. Lowndes County*, the Fifth Circuit provided an instructive summary of the considerations at play when determining the extent of public employees' First Amendment speech and association rights:

> Courts must balance [ ] important public and individual interests in order to determine the constitutionality of particular adverse employment actions. The balancing test pertinent here considers among other things the policy sensitivity of the employment, the nature and content of the employee's speech or political activity, the extent of public concern implicated by the speech, and whether close confidential working relations with elected officials are necessary. This circuit, interpreting the [Supreme Court's] decisions, places cases involving only political association, only speech, or a combination of the two on a spectrum. Where non-policymaking, non-confidential employees are discharged solely because of their private political views, little, if any, weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail. On the opposite end of the spectrum, however, are cases where employees' exercise of First Amendment privileges clearly over-balanced their usefulness. When cases fall within the spectrum, courts are to balance the extent to which "public concerns" are implicated by the employees' speech or association against the significance of maintaining a close or confidential working relationship with the public employer. . . . [W]here a public employee . . . occupies a confidential or policymaking role, the employer's interests more easily outweigh the employee's First Amendment rights.[33]

In *McBee v. Jim Hogg County*, the Fifth Circuit synthesized Supreme Court decisions regarding public employee speech and affiliation to establish a balancing test that applies to cases

---

[32] *Gentry v. Lowndes County, Miss.*, 337 F.3d 481 (5th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 357, 360 (1976) & *Branti v. Finkel*, 445 U.S. 507, 518 (1980)).

[33] *Id.*

of this nature.[34] *McBee* held that each public discharge case should "be considered on its particular facts, sifting through such factors and circumstances as the [Supreme Court in *Connick v. Myers*][35] outlined in order to strike the proper balance between the employee's speech and associational rights as citizen and the state's right as an employer to loyal and efficient service."[36]

Under *McBee*, a court evaluating a First Amendment claim by a public employee should, in locating the claim on the spectrum of employee and employer interests, consider the degree to which the employee's speech or political activities "involve 'public concerns' and whether 'close working relationships are essential to fulfilling [the employee's] public responsibilities.'"[37] If the court finds that close working relationships are essential, "it must then determine whether the particular speech [and other conduct] sufficiently disrupted the working relationship as to prevent effective performance, requiring a stronger showing of disruption as the employee's speech moves closer to core 'public concerns.'"[38] In determining the degree of the disruptive nature of the speech or conduct, the court should consider "the time, place, and manner of the political activity" and "whether, taken in context, the particular activity was sufficiently hostile, abusive, or insubordinate as to disrupt significantly the continued operation of the office."[39]

---

[34] *McBee v. Jim Hogg County,* 730 F.2d 1009, 1014 (5th Cir. 1984) (en banc). Specifically, the Fifth Circuit synthesized the Supreme Court's decisions regarding pure speech, *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983), in which the Court established a balancing test for weighing employees' interest in the speech against the public employer's interest in efficiently and effectively carrying out its charge, and the Court's decisions regarding political affiliation or "patronage dismissal," *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980), which held that elected officials may dismiss employees based on their political affiliation when those employees hold policymaking or confidential positions that require trust and loyalty.

[35] 461 U.S. 138 (1983).

[36] *McBee*, 730 F.2d at 1014.

[37] *Id.* at 1016 (quoting *Connick*, 461 U.S. at 151-52).

[38] *Id*. at 1017 (quoting *Connick*, 461 U.S. at 152).

[39] *Id*.

Where employees hold policymaking or confidential positions their "First Amendment rights are more easily outweighed in balancing interests."[40] A confidential employee is one who has "access to confidential documents or other materials that embody policymaking deliberations and determinations, e.g., as a private secretary to a policymaker."[41]

Applying the *Pickering/McBee* test, the Fifth Circuit has held, in various contexts, that elected officials were justified in terminating employees where their speech or affiliation disrupted a working relationship so as to prevent effective performance of the official's duties.[42] Of particular relevance, the Fifth Circuit has recognized that the secretary to an elected official (a police chief), who did the official's typing and filing and was privy to his confidential files and documents, was a "confidential employee requiring complete loyalty to the [official]."[43] The court based its holding that the official may dismiss his secretary because of her political affiliation on "a realistic understanding of the confidential relationship between secretaries and their bosses."[44]

Importantly, a public employee may be subject to dismissal based on speech or political affiliation even though the nature of her work, or the nature of the work performed by the elected official who employs her, is not inherently political or partisan.[45] In *Stegmaier*, the Fifth Circuit

---

[40] *Kinsey v. Salado Independent School District*, 950 F.2d 988, 994 (5th Cir. 1992). Though the Supreme Court has rejected strict application of the "policymaker" and "confidential" categories to preclude First Amendment violations, these categories nevertheless "illuminate the countours of the employee class that may permissibly be subjected to a political litmus test." *Wiggins v. Lowndes Cty., Miss*, 363 F. 3d 387, 390 (5th Cir. 2004) (quoting *Barrett v. Thomas*, 649 F.2d 1193, 1201 (5th Cir.1981)).

[41] *Aucoin v. Haney*, 306 F. 3d at 273 (citations omitted).

[42] *E.g.*, *Kinsey*, 950 F.2d 988 (school superintendent's right to speech and association was not violated when elected school board officials terminated him for opposing their election); *Gentry*, 337 F. 3d at 488 (dismissal of county road manager and county administrator was Constitutional where employee's duties included responsibilities that would "strongly influence the public's view of the elected board supervisors").

[43] *Soderstrum v. Town of Grand Isle*, 925 F.2d 135, 140 (5th Cir. 1991).

[44] *Id*. at 140.

[45] *Stegmaier v. Trammell*, 597 F.2d 1027, 1040 (5th Cir.1979). Though the framework for analyzing patronage dismissals has evolved significantly since *Stegmaier*, it has never been explicitly overruled and is still good law. See *Kinsey*, 950 F. 2d at 994 (citing to *Stegmaier* as valid precedent in conducting *Pickering/McBee* balancing); see also *Wiggins*, 363 F. 3d at 391 (citing the holding in *Stegmaier* that "a confidential employee may be one

held that an elected Alabama Circuit Clerk could dismiss his Deputy Circuit Clerk for political affiliation even though the Deputy Circuit Clerk "[did] not stand in a confidential relationship to a policymaker or a policymaking process."[46] In so holding, the court recognized that

> Where a state, through its constitution, has decided to make certain public offices elective, it has also chosen to vest the electorate with the power to select one candidate over another for any reason. In the case of a Circuit Clerk under the Alabama unified judicial system, it is clear that a candidate for the office of Circuit Clerk can have no "policy platform" on which to seek office since policy decisions as to the operation of his office, the administration of justice, practice and procedure in the circuit courts, and the expenditure of funds are beyond his duty and authority. The public, however, does have the right under the Alabama Constitution to elect its Circuit Clerks and, presumably, attempts to elect capable and honest individuals when doing so. If there is any policy "presumably sanctioned by the electorate" in its election of one individual as Circuit Clerk over another, it is that of honesty and integrity.[47]

In other words, an elected office—such as that of a judge—need not be inherently partisan for political affiliation to matter. The important inquiry is whether political affiliation or speech undermines the working relationship between the elected official and his employees in "close relationship" to him and whose complete loyalty he is entitled to expect.[48]

At the outset, it is important to note that Zuniga's Complaint acknowledges that her political affiliation and Facebook posts were not the only factors in her termination.[49] Indeed, the TWC Statement references—and even emphasizes—several performance issues that, together with Zuniga's unprofessional and politically disparaging posts, undermined Judge Yeary's trust and confidence in her ability and willingness to assist him in carrying out his judicial duties. These

---

who is in a position to subject an elected official to personal liability" regardless of whether that employee is in a confidential relationship to a policymaker); *Foster v. Smith*, No. 16-cv-091, 2017 WL 2978001 at *2 n. 1 (N.D. Miss. Jul. 10. 2017) (noting that *Stegmaier* is still good law).

[46] *Stegmaier*, 579 F. 2d at 1040.

[47] *Id*.

[48] *McBee*, 730 F. 2d at 1016.

[49] Compl. ¶ 18.

factors included attendance problems, failure to complete reasonable assignments, apparent dissatisfaction with the job, and inaccurate leave reporting.[50] While Zuniga certainly made posts that were political in nature, the posts Judge Yeary described as unacceptable were the ones that featured nudity, discussed "choosing pussy over a huge dick," and referred to him and other judges of the Court of Criminal Appeals as "Damn Republicans."[51] At base, Zuniga has alleged no facts establishing that it was her political views—rather than the inappropriate nature of her posts—that resulted in her termination.[52]

However, even if Zuniga has sufficiently pleaded she was terminated simply for having different political views from Judge Yeary, this would not violate the First Amendment. As explained above, courts must consider the complaint's "particular facts . . . in order to strike the proper balance" between the employee's interest in the speech or affiliation and the employer's interest in efficiently and effectively discharging his public duties.[53] When this balancing test is applied to Zuniga's allegations, they do not give rise to a claim that is plausible on its face.

1. **When the Facebook posts at issue are viewed in their totality, Zuniga's interest in this speech does not weigh heavily in her favor.**

The first step in the *Pickering/McBee* balancing test is assessing whether, and the extent to which, the alleged speech was made in the employee's capacity as a citizen (as opposed to a government employee) and involved matters of public concern.[54] For purposes of this motion to

---

[50] **Ex. 1**.

[51] See generally Compl. ¶¶ 14-19; **Ex. 1 at 2-4**.

[52] Upon amending her Complaint, Zuniga added the highly speculative (and inaccurate) allegation that some person or persons who use the name "Kevin Yeary" on Twitter have approved of vulgar comments when such comments favor Republican issues or candidates. Such tenuous allegations are the type of "unwarranted factual inference" courts are not required to accept as true for purposes of a motion to dismiss. In fact, the referenced Twitter accounts do not belong to Judge Yeary and do not reflect his approval.

[53] *McBee*, 730 F. 2d at 1016.

[54] *Id.*; see also *Garcetti v. Ceballos*, 547 U.S. 410, 418 (citing *Pickering v. Bd. of Educ.*, 391 U.S. at 568; *Connick v. Myers*, 461 U.S. 138 (1983)).

dismiss only, Defendant will assume that at least some of the Facebook posts at issue in this lawsuit were Zuniga's citizen speech. Zuniga, like all citizens, has an interest in discussing elected officials and partisan politics.[55] This interest captures not only the individual's "own personal gain, if any, from speaking," but also "the social value of that speech."[56]

However, not all the speech with which Judge Yeary took issue involved matters of public concern. At issue were posts of a non-political nature which he viewed as unprofessional and offensive, such as posts containing scandalous images of "pantiless" women and Zuniga's inquiry: "Is anyone commando today?"[57] Such posts are not political in nature and do not touch on matters of public concern. Thus, while the court may assume, for purposes of this motion, that Zuniga had some private citizen speech of a political nature, the speech at issue, on the whole, does not clearly weigh heavily in favor of her interests for balancing purposes.

### 2. A close working relationship between a judge and his executive assistant is essential to the judge's ability to effectively fulfill his public duties.

Once an employee's interest in the speech is assessed, courts must determine "whether close working relationships are essential to fulfilling [the official's] public responsibilities."[58] As a judge on the highest criminal court in Texas, Judge Yeary is a policymaker. His actions in interpreting and applying Texas laws and the Constitution and adjudicating criminal matters involve making and guiding laws and policy in the state. A judge's chambers and files are replete with the court's confidential information relating to legal matters that are often of great significance and impact. Chambers is also a place where judges must be free to grapple with the

---

[55] *E.g.*, *Rankin v. McPherson*, 483 U.S. 378, 386–87 (1987).

[56] *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir. 2004).

[57] **Ex. 1 at 3-4**; **Ex. 17 & 18**.

[58] *McBee*, 730 F. 2d at 1016.

complex issues they adjudicate freely, openly, and without fear of political retribution. As Judge Yeary's executive assistant, Zuniga had access to and worked with such materials as pre-decisional judicial work product, was privy to aspects of Judge Yeary's deliberative process, and would have had access to matters of public importance before their release to the public. Although no court within the Fifth Circuit has specifically analyzed the relationship of an elected judge with his chambers staff, the Seventh Circuit has acknowledged that "[w]hat may distinguish judges for patronage purposes is the unique relationship they have with the people who work with them in their chambers."[59]

As Judge Yeary's executive assistant, Zuniga was a confidential employee because she, at a minimum, had "access to confidential documents or other materials that embody policymaking deliberations and determinations,"[60] such as Judge Yeary's pre-decisional legal opinions and other confidential case matters.[61] Secretaries or executive assistants dedicated to a specific elected official often have such access.[62] It is inherent in the very title "executive assistant" that the employee's role is in helping the official do his or her job—not someone else's job.

In attempting to disavow the political nature of the confidential case-related documents and pre-decisional materials she accessed and used in her work, Zuniga appears to confuse the

---

[59] *Meeks v. Grimes,* 779 F.2d 417, 423 (7th Cir. 1985) (noting, in the judicial context, that "those employees who work in direct and constant contact with a political official-employer would be exempted from the First Amendment's protection against patronage dismissals"); see also *Matherne v. Wilson*, 851 F. 2d 752, 761 (5th Cir. 1988) (recognizing "the politically sensitive requirements of a confidential aide to a politically elected official").

[60] *Aucoin v. Haney*, 306 F. 3d at 273 (citations omitted).

[61] As noted above, Zuniga's Complaint is notably devoid of allegations relating to the actual job duties of the executive assistant position she held. However, her allegation that she had access to and worked with Judge Yeary's case-related documents is sufficient, in the context of a judicial employee, to categorize her as "confidential."

[62] See *Soderstrum*, 925 F.2d at 141-42.

concepts of policy-making and partisanship.[63] While such confidential court materials may not be partisan in nature, they clearly relate to the legal policy-making function Judge Yeary was elected to carry out. An elected official's policymaking need not be partisan in order to entitle him to choose his staff based on loyalty and trust.[64] Indeed, the law does not even require that the office carry out policymaking at all if the nature of the relationship between the elected official and his employee is such that it requires complete trust and loyalty.[65] Here, Zuniga has pleaded, at a minimum, that her job required her to access Judge Yeary's confidential case-related policymaking documents and information. Given the power vested in state courts of last resort like the Texas Court of Criminal Appeals, it is paramount that such elected officials have significant trust and confidence in those who access and work with such information.

### 3. Zuniga's Facebook posts, in which she referred to Judge Yeary, his colleagues, and other Texas politicians as "Damn Republicans" and "Republican assholes" sufficiently disrupted the working relationship as to prevent effective performance.

Once a court has determined that a close working relationship is essential, it must then look determine whether the particular speech sufficiently disrupted the working relationship as to prevent effective performance.[66] "Relevant to the determination of disruptive effect is the time, place and manner of the political activity."[67] For example, when speech is broadcast to the public, it has more potential to undermine a government employer's authority.[68] Courts should also

---

[63] See Compl. ¶ 22 (acknowledging that Zuniga "had access to some internal Court information relating to the criminal cases before the Court," but nevertheless asserting that her "job duties did not include anything of a political nature").

[64] See *Stegmaier*, 579 F. 2d at 1040.

[65] See *id.*

[66] *McBee*, 370 F. 3d at 1017.

[67] *Id.*

[68] *McPherson*, 483 U.S. at 389.

consider whether, taken in context, the particular activity could be considered sufficiently hostile, abusive or insubordinate as to significantly disrupt the continued operation of the office.[69]

As an initial matter, the Facebook posts Zuniga has put at issue contradict her subjective view that her speech was not disruptive.[70] Zuniga's posts referring to "my judge" as a "damn republican" and confirming that she works under a "DICK-TATORSHIP" evinces a lack of faith and loyalty to Judge Yeary and court she served.[71] Such expressions are certainly hostile to Judge Yeary, his colleagues, and the political party with which he affiliates for election purposes.

Moreover, the place and manner of these posts is significant. Zuniga's offensive speech was available on her public Facebook profile and placed alongside numerous references to her work for the Court of Criminal Appeals, pictures of Judge Yeary, and comments indicating her status as a chambers employee in a close relationship to "her judge." Zuniga's public association with Judge Yeary as a member of his personal staff next to her speech disparaging the Court and other Republican judges and officials, undermines several important judicial interests.

First, it is especially important for judges and their staff to avoid behavior that might undermine the court's authority.[72] An important way that courts further this interest is by avoiding bias, whether actual or apparent. Though judges in Texas are elected in partisan elections, they

---

[69] *Id.*; see also *Connick*, 461 U.S. at 154 (public employers are not required to "tolerate action which [they] reasonably believ[e] would disrupt the office, undermine [their] authority, and destroy close working relationships.").

[70] See Compl. ¶ 24.

[71] This Court need not accept as true Zuniga's averment that "[t]hroughout her employment for Defendant Yeary and the Court, Ms. Zuniga expressed her full support for Yeary and the Court," where, as here, matters contained in the pleadings (i.e., the Facebook posts central to Zuniga's claims) directly contradict such allegations. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 238 F. Supp. 3d 799, 816 (S.D. Tex. 2017) ("When conclusory allegations and unwarranted deductions of fact are contradicted by facts disclosed in the appended exhibit, which is treated as part of the complaint, the allegations are not admitted as true."), citing *Carter v. Target Corp.*, 541 Fed. Appx. 413, 417 (5th Cir. 2013), citing *Assoc. Builders, Inc. v. Alabama Power Co.*, 505 F. 2d 97, 100 (5th Cir. 1974)).

[72] See generally *id*; *McPherson*, 483 U.S. at 389 (recognizing the "danger" that a government employee "could discredit the office by making [a particular] statement in public").

discharge their official duties without bias and in accordance with Texas laws and Constitution. Under the Texas Canons of Judicial Conduct "[a] judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice…and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so."[73] Similarly, under Canon III(C)(2), "[a] judge should require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties."[74]

Zuniga's public post stating "I work for damn Republicans" suggests that politically elected judges decide cases based upon the political party they belong to, rather than based upon their application of the law to the facts of any given case. In a similar vein, in a May 13, 2016 public post, Zuniga shared a link discussing a recent Texas Supreme Court decision, and wrote: "Shame on the Texas Supreme Court. Damn Republicans."[75] This also suggests that—at least in Zuniga's opinion—partisan elected judges cannot be trusted to serve their official functions, simply because they belong to a political party. This is troubling coming from someone who worked closely with judges on the Texas Court of Criminal Appeals for approximately 15 years. And the fact that Zuniga's commentary is available to anyone with a Facebook account—and is offered in the context of posts associating herself with the Judge Yeary and the Court of Criminal Appeals—undermines Judge Yeary's interest in maintaining authority and credibility.

Additionally, the speech at issue here could impact Judge Yeary's working relationships with his Republican colleagues, including those on the bench. Zuniga's posts referring to

---

[73] Canon III(B)(6).

[74] See also Canon III(B)(4) ("A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.").

[75] **Ex. 16**.

"Republican assholes," have potential to undermine such relationships, as does her statement affirming that her job at the Texas Court of Criminal Appeals amounts to working in a "DICK-TATORSHIP." Notably, Zuniga's posts were not limited to her general disagreement with the Republican party platform, but constituted direct attacks on high-ranking members of the Texas Republican party, such as Governor Greg Abbott and Lt. Governor Dan Patrick.[76] For a politically elected official, this can undermine important working relationships with other members of his party. And for a judge, it could certainly undermine the credibility of the Court.

On the face of the pleadings, the interests in maintaining the Court of Criminal Appeals' credibility, preserving professionalism among the Court and its employees, and preserving working relationships among elected officials outweighs Zuniga's asserted interest in publicizing the statements at issue here, especially considering they were made alongside posts identifying her as Judge Yeary's employee.[77] Because Zuniga was a confidential employee who worked in close proximity to Judge Yeary and had access to his confidential policymaking documents and information, the balancing tips heavily in Judge Yeary's favor.

**B. Even if Zuniga alleged a First Amendment violation, Judge Yeary is entitled to qualified immunity in his individual capacity.**

Qualified immunity "shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[78] "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."[79] Once

---

[76] **Ex. 14 & 15**.

[77] *See, e.g., Graziosi v. City of Greenville Miss.*, 775 F.3d at 733, 741 (city's substantial interests in maintaining discipline and preventing insubordination within police department outweighed sergeant's First Amendment interest in criticizing her superior officer on the Mayor's public Facebook page).

[78] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[79] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation omitted).

a state official has asserted qualified immunity, the burden shifts to the plaintiff to show that qualified immunity does not bar her recovery.[80] "[Q]ualified immunity questions should be resolved at the earliest possible stage of litigation," in part "to protect public officials from [ ] broad-ranging discovery."[81]

To defeat a motion to dismiss for failure to state a claim after the defendant has asserted qualified immunity, the plaintiff must state facts which, if proved, would defeat qualified immunity.[82] In assessing whether qualified immunity applies, courts first ask whether the defendant's actions violated a clearly-established right.[83] A right is clearly established if the law is clear in a particularized sense, such that a reasonable official would be put on notice that her conduct is unlawful and violates the right in question.[84] The Supreme Court has repeatedly "reiterate[d] the longstanding principle that clearly established law should not be defined at a high level of generality," but must instead be "particularized to the facts of the case."[85] "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply" and the unlawfulness of the defendant's conduct must "follow immediately from the conclusion that the rule was firmly established."[86] In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."[87]

---

[80] *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

[81] *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (internal quotation marks omitted).

[82] *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018).

[83] *Flores v. City of Palacios*, 381 F.3d 391, 393–94 (5th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[84] *Wernecke v. Garcia*, 591 F.3d 386, 392–93 (5th Cir. 2009).

[85] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotations marks omitted).

[86] *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

[87] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

If the court finds that the right is clearly established, then it must ask "whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'"[88] "In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper."[89]

For the reasons above, Zuniga did not suffer violation of her First Amendment right to free speech. But the Court need not reach this conclusion to dismiss the individual capacity claim against Judge Yeary, because no factually analogous precedent places the constitutionality of Zuniga's alleged termination "beyond debate." Even if the closest employees of the Judges of the highest criminal Court in Texas had a right to the sort of expression Zuniga wishes to engage in publicly—while at the same time publicly associating themselves with the Court—such a right is certainly not "clearly established."

To the contrary, under governing First Amendment jurisprudence and given the facts of this case, it was not objectively unreasonable for Judge Yeary to believe he could dismiss an employee who had access to his confidential, pre-decisional legal materials and where that employee publicly expressed distain for him, his colleagues, and members of his political party while, in the same forum, openly associating herself with the Court. To overcome the qualified immunity defense, Zuniga has the burden to plead facts establishing that Judge Yeary is not entitled to this defense. However, Zuniga's amended pleadings are notably sparse with respect to a central issue in this analysis—the job responsibilities of a judicial executive assistant.[90] Nevertheless, the

---

[88] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[89] *Harlow*, 457 U.S. at 818.

[90] Zuniga has already had the opportunity to replead following Judge Yeary's first assertion of the qualified immunity defense, and the Court should not allow her yet another opportunity to replead. In any event, amendment in this instance would be futile since further allegations regarding the nature of the executive

general nature of the confidential policy-making work performed in judicial chambers combined with Zuniga's averment that she had access to Judge Yeary's case-related files and information is sufficient, in itself, to show that she was in a close, confidential relationship requiring the level of trust and loyalty that overcomes her right to exercise the speech at issue. At the very least, these facts show that Judge Yeary was reasonable in believing Zuniga was exempt from First Amendment protections. Thus, it is appropriate to dismiss the individual capacity claims against Judge Yeary at this stage.[91]

## CONCLUSION

For the reasons set forth herein, Judge Yeary asks this Court to dismiss Zuniga's claims in their entirety because she has failed to state a claim to which there is a plausible right to relief. Judge Yeary further requests that the Court grant his qualified immunity defense and dismiss the claims against him in his individual capacity.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

---

assistant role would only add further weight to Judge Yeary's side of the balancing scale as the position includes duties such as the following:

- "assisting judge and attorneys with case management, docket control, correspondence and legal editing;"
- "coordinates calendars, meetings, and other activities with other governmental agencies, executives, and organizations on behalf of the judge;"
- "assists in the planning or preparation of letters, memoranda and publications;"
- "assists in interpreting policies and procedures and making administrative decisions as appropriate;"
- "may communicate agency objectives, tasks, and decisions to staff on behalf of the judge." **Ex. 2 at 2**.

[91] *Pearson v. Callahan*, 555 U.S. 223, 231 ("[W]e have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery."") (alteration original) (citations omitted).

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

AMANDA J. COCHRAN-MCCALL
Chief, General Litigation Division

*/s/Emily Ardolino*
EMILY ARDOLINO
Texas Bar No. 24078898
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4074
(512) 320-0667 FAX
emily.ardolino@oag.texas.gov

ATTORNEYS FOR DEFENDANT

### CERTIFICATE OF SERVICE

I certify that on March 28, 2019 the foregoing document was filed via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/Emily Ardolino*
EMILY ARDOLINO
Assistant Attorney General